# UNITED STATES DISTRICT COURT

# SOUTHERN DISTRICT OF GEORGIA

# STATESBORO DIVISION

SARAH JANE WALKER,            )
                              )
    Claimant,           )
                              )
v.                            )    Case No. CV610-080
                              )
MICHAEL J. ASTRUE,            )
*Commissioner of Social Security,*  )
                              )
    Defendant.          )

## REPORT AND RECOMMENDATION

Claimant Sarah Jane Walker, a 52-year-old former cook and textile machine operator (tr. 95, 131), sought social security disability benefits and supplemental security income due to back problems, migraines, head and eye injuries, forgetfulness, left shoulder pain, lupus, dermatitis, reflux disease, and mild mental retardation. (Tr. 13-15, 140, 154, 174, & 176.) Her claim was denied initially and on reconsideration. (Tr. 69-72 (initial denial); tr. 74-76 (reconsideration).)

Thereafter, she requested a hearing before an Administrative Law Judge ("ALJ"), which was held on September 30, 2009. (Tr. 48-66.) The ALJ entered an order denying Walker's benefits application on January

7, 2010. (Tr. 11-21.) The Appeals Council denied her request for review, making the ALJ's decision the final decision of the Commissioner. (Tr. 1-5.) Walker then filed a complaint for judicial review in this Court, contending that the ALJ erred in reaching his decision. For the reasons set forth below, the Commissioner's decision denying benefits should be **AFFIRMED**.

## I. STANDARD OF REVIEW

Affirmance of the ALJ's decision is mandatory if his conclusions are supported by substantial evidence and based upon an application of correct legal standards. 42 U.S.C. § 405(g); *Wilson v. Barnhart*, 284 F.3d 1219, 1221 (11th Cir. 2002); *Lewis v. Callahan*, 125 F.3d 1436, 1439 (11th Cir. 1997). "Substantial evidence is something more than a mere scintilla, but less than a preponderance." *Dyer v. Barnhart*, 395 F.3d 1206, 1210 (11th Cir. 2005) (quotation marks and citations omitted). It "is such relevant evidence as a reasonable person would accept as adequate to support a conclusion." *Crawford v. Comm'r of Soc. Sec.*, 363 F.3d 1155, 1158 (11th Cir. 2004) (quotation marks and citations omitted). If substantial evidence supports the decision, the Court will affirm "[e]ven if the evidence preponderates against the Commissioner's

findings." *Id.* at 1158-1159. This Court cannot substitute its judgment for that of the Commissioner. *Barnes v. Sullivan*, 932 F.2d 1356, 1357-1358 (11th Cir. 1991).

The burden of proving disability lies with the claimant. 20 C.F.R. § 404.1512; *Moore v. Barnhart*, 405 F.3d 1208, 1211 (11th Cir. 2005). To determine whether he has met his burden of proof, the Court looks to the five-step evaluation process set forth in the Social Security Regulations. 20 C.F.R. § 416.920; *Dixon v. Astrue*, 312 F. App'x 227, 227-28 (11th Cir. 2009); *Jones v. Apfel*, 190 F.3d 1224, 1228 (11th Cir. 1999). At step one, the claimant must prove that he has not engaged in substantial gainful activity. *Jones*, 190 F.3d at 1228. At step two, she must demonstrate a severe impairment or combination of impairments. *Id.* Then, at step three, if the claimant's impairment meets or equals a listed impairment (*see* 20 C.F.R. Pt. 404, Subpt. P, App'x 1), she is automatically found disabled. *Id.* If not, she must advance to step four, which requires her to prove an inability to perform past relevant work. *Id.* If she cannot perform past relevant work, stage five shifts the burden to the Commissioner to show that "there is other work available in significant

numbers in the national economy that the claimant is able to perform."

*Id.*

## II. ANALYSIS

### A. The ALJ's Determination

In order to frame Walker's contentions, it is first necessary to discuss the ALJ's analysis. At step one of the five-step analysis, he found that she had not engaged in substantial gainful activity since February 2, 2006. (Tr. 13.) At step two, he found that her only severe medical impairments were depressive disorder and a history of polysubstance abuse. (Tr. 13-15.)

During his step two discussion, the ALJ first listed the allegedly disabling conditions:

> The claimant alleges that she is disabled by back problems, migraines, prior head and eye injuries, forgetfulness, and, during a May 26, 2007 consultative evaluation, left shoulder pain (Exhibits 3E, 7E, 10E, 12F). In a brief dated September 23, 2009, claimant's representative argued that in addition to mental impairments, claimant's musculoskeletal complaints have been assessed as bursitis of the shoulders and sciatica and that based on laboratory results, lupus. Medical records document that she suffers with headaches, dermatitis, GERD, and decreased visual acuity, while the evidence of record supports that the claimant's mild mental retardation meets Listing 12.05B (Exhibit 15E).

(Tr. 13.) He discounted the vast majority of her disabling conditions based upon a paucity of medical evidence of record. For instance, while Walker reported eye problems,[1] the ALJ found that she merely needed to wear glasses. (Tr. 13-14.) As for her complaints of back problems, sciatica, and shoulder pain, the ALJ noted that the medical evidence only supported some minor lumbar tenderness. Walker had a normal range of motion, was neurologically sound, ambulated without assistance, did not appear to be in any distress while walking or sitting, did not take any pain medication, and was able to clean a friend's house to help cover rent. (*Id.*)

Additionally, the ALJ noted that Walker managed to work in a cafeteria job for some time with no reports of pain; she feared losing the job due to her criminal record (she had been imprisoned on drug charges), not based upon her inability to do the job. (Tr. 14-15.) She suffered from bursitis in the shoulder, but the ALJ found that the pain was reducible. (Tr. 14.) While she had a high anti-nuclear antibody ("ANA") reading, which indicates a possible autoimmune disorder, her

---

[1] She claims to have been stabbed in the eye by a needle while working at textile plant. (Tr. 62-63.) The ALJ noted that she produced no medical evidence documenting this injury. (Tr. 13-14.)

rheumatoid arthritis factor and erythrocyte sedimentation rate, which tests for inflammation, were normal; the ALJ noted that a heightened ANA reading may occur in healthy individuals and there was no formal diagnosis of lupus anywhere in the record. (*Id.*) Walker suffers from GERD, but it was not alleged or shown to cause any limitations of functioning. (*Id.*) In sum, the ALJ found that there was no objective medical evidence of record supporting the majority of her claimed limitations or her subjective allegations of pain. (*Id.*)

Walker's claims of depression and substance abuse, however, were supported by the record. (Tr. 14-15.) She had been incarcerated based on drug charges and had sought treatment. (Tr. 15.) Additionally, she had been diagnosed and treated for depressive disorder, not otherwise specified. (*Id.*) The ALJ, however, discredited her claim that she had difficulty with reading and comprehending. (Tr. 14-15.) Most importantly for present purposes, the ALJ also determined that while claimant's intelligence quotient ("IQ") scores suggested mild mental retardation, she failed to show a lifelong cognitive deficit. (Tr. 15.) According to the ALJ, her cognitive deficits were likely secondary to

organic mental disorder possibly attributable to her substance abuse. (*Id.*)

At step three, the ALJ found that claimant failed to meet any 20 C.F.R. Pt. 404, Subpt. P, App'x 1 listings. (Tr. 16.) Claimant had argued that she met the listings for mild mental retardation under 12.05, but the ALJ disagreed, reasoning that she had not shown any cognitive deficits prior to age 22, which is required to meet any of the applicable 12.05 retardation-related listings. Additionally he found that Walker had only mild restrictions in activities of daily living and social functioning. (*Id.*) As for concentration, persistence, and pace, she suffers from mild to moderate difficulties. (*Id.*) Claimant, however, lacked any "marked" limitations and had no episodes of decompensation. (*Id.*)

Turning to step four, the ALJ found that claimant could perform a full range of work at all exertional levels, with a few non-exertional caveats. (Tr. 16-17.) For instance, Walker has some limitations in concentration, persistence, or pace, but could still perform simple, repetitive, low-demand tasks. (Tr. 17.) In making his determination, the ALJ noted that while claimant's medically determinable impairments could reasonably be expected to produce the alleged symptoms, her

statements concerning the intensity, persistence, and limiting effects of the symptoms were not credible and were not supported by objective medical evidence of record. (Tr. 18.) Based upon his residual functional capacity finding, the ALJ concluded at step five that claimant could perform her past relevant work as a cook as she actually performed it. (Tr. 21.) Hence, she was not disabled. (*Id.*)

## B. Walker's Claims

Walker contends that the ALJ's opinion is not supported by substantial evidence. Specifically, she argues that the ALJ erred by (1) failing to find she met listing 12.05(B) for mental retardation; (2) failing to find she met listing 12.05(C), also for mental retardation; (3) failing to find that her impairments *equaled* 12.05(B) or (C); and (4) failing to develop a full and fair record. (Doc. 9 at 6.)

### 1. *Listings*

Walker claims that the ALJ erred at step three by finding that her impairments did not meet or equal listings 12.05(B) & (C) relating to mild mental retardation. (Doc. 9 at 18-25.) Dr. Steve Chester, an examining psychologist, found that Walker's verbal, performance, and full scale IQ scores are 59, 56, and 53, respectively. (Tr. 297 (Dr.

Chester's opinion based upon administering the Wechsler Adult Intelligence Scale -- Third Edition); doc. 14 at 7 (gov't's br.).) Listing 12.05(B) requires a "[v]alid verbal, performance, or full scale IQ of 59 or less," whereas 12.05(C) requires "[a] valid verbal, performance, or full scale IQ of 60 through 70 and a physical or other mental impairment imposing an additional and significant work-related limitation of function." *Id.* Claimant contends that based upon her IQ scores and her other "severe" impairments (i.e., her "severe" depression), she meets both listings. (Doc. 9.)

The ALJ found that claimant did not meet a shared prerequisite under listings 12.05(B) & (C): that the evidence "demonstrates or supports onset of the impairment before age 22.". 20 C.F.R. Pt. 404, Subpt. P, App'x 1, listing 12.05. Hence, he reasoned that Walker was not *per se* disabled for meeting or equaling a listing. Claimant contends that this was error. The ALJ, according to Walker, failed to apply the presumption established by *Hodges v. Barnhart*, 276 F.3d 1265, 1266

(11th Cir. 2001), that the impairment existed prior to the age of 22.[2]
(Doc. 9 at 15.)

In *Hodges*, the Eleventh Circuit acknowledged that IQ scores remain fairly uniform throughout life absent head trauma or some other intervening circumstance. *Hodges*, 276 F.3d at 1268-69. Hence, the ALJ is to presume based upon valid adult IQ scores that mental retardation arose before age 22. *Id.* at 1269. That presumption, however, may be rebutted through the introduction of contradictory evidence. *Id.* Here, the ALJ spent a considerable amount of time undercutting that presumption. Most importantly, he noted that claimant was an admitted drug and alcohol abuser with a history of polysubstance dependence. (Tr. 16.) This drug abuse, according to the ALJ, accounted for her low IQ scores. Claimant's mental deficiencies thus resulted from an organic brain disorder rather than developmental mental retardation.[3] In support, he pointed to a non-examining state consultant's finding that

---

[2] Admittedly, the ALJ never cited *Hodges* or explicitly applied the presumption. (Tr. 16.) Nevertheless, there is substantial support for his conclusion that claimant did not manifest deficits in adaptive functioning prior to the age of 22.

[3] Organic brain disorders are evaluated under Listing 12.02. 20 C.F.R. Pt. 404, Subpt. P., App'x 1. The listing is difficult to meet since it requires serious limitations in certain activities or repeated episodes of extended decompensation.

claimant's IQ scores were not conclusive, since it was possible that substance abuse had affected the scores. (Tr. 334.)

Walker contends that the ALJ erred by relying upon the non-examining state agency psychologist over the opinion of Dr. Chester, an examining psychologist who diagnosed Walker as suffering from mild mental retardation.[4] (Doc. 9 at 20; tr. 299.) Since the Diagnostic and Statistical Manual of Mental Disorders (Fourth Edition) ("DSM") defines mild mental retardation as having an onset prior to the age of 18, claimant contends that Dr. Chester necessarily concluded that the impairments existed before claimant turned 22. (Doc. 9 at 17, 19-20.) The state examiner, on the other hand, did not find mental retardation (tr. 322), but instead categorized the low IQ scores as resulting from an organic mental disorder. (Tr. 323.) She also noted that it was unclear whether the condition was lifelong or related to claimant's substance abuse. (Tr. 334.) According to claimant, the ALJ erred by finding no

---

[4] Here, the ALJ incorrectly states that a state psychological consultant found the test scores to be unreliable. (Tr. 16.) The consultant did not assess Walker as mentally retarded since it was possible that her substance abuse had affected the scores. (Tr. 334 (psychiatric review form completed by Linda O'Neil, PhD).) She never affirmatively stated that the test results were unreliable. (*Id.*) Taken in context, however, the Court is satisfied that the ALJ's opinion was based upon his finding that claimant's mental deficits did not arise prior to age 22, not upon a finding that the IQ scores were invalid. (Tr. 16.)

mental retardation based upon the non-examining state psychologist's "uncertain" assessment. (Doc. 9 at 19-20.)

Generally, the opinions of examining physicians are given more weight than those of non-examining physicians." *McNamee v. Soc. Sec. Admin.*, 164 F. App'x 919, 923 (11th Cir. 2006) (citing 20 C.F.R. § 404.1527(d)(1), (2) & (5)). Here, there is no dispute that Dr. Chester was an examining physician. An ALJ, however, may accord more or less weight to such a source if there is good cause to do so. *See Edwards v. Sullivan*, 937 F.2d 580, 583-84 (11th Cir. 1991). That is, the Commissioner need not give the physician's opinion controlling weight, nor is the physician's opinion dispositive, since the determination of disability is reserved to the Commissioner. *Garred v. Astrue*, 2010 WL 2412128 at * 1 (11th Cir. June 16, 2010). The case law makes clear that good cause exists for rejecting a treating physician's findings when that opinion is not bolstered by the evidence or the evidence supports a contrary finding. *Phillips v. Barnhart*, 357 F.3d 1232, 1241 (11th Cir. 2004); *see Crawford*, 363 F.3d at 1159 ("A treating physician's report 'may be discounted when it is not accompanied by objective medical evidence or is wholly conclusory.'") (cite omitted).

Here, Dr. Chester conducted two assessments. During the first, performed on February 27, 2008, he administered the Wechsler Adult Intelligence Scale, briefly summarized Walker's medical history, and diagnosed her as suffering from mild mental retardation, among other things. (Tr. 295-300.) He took her at her word that she only managed to complete the fifth grade with special education assistance. (Tr. 296.) At the second assessment, on May 2, 2007, he again diagnosed mild mental retardation. (Tr. 313-316.) Again, he noted that she required special education assistance in school. (Tr. 314.)

Both examinations occurred before Walker's school records were obtained. (Tr. 208-9.) Elsewhere in the opinion, the ALJ examined Walker's school records in detail and found that she received special assistance not due to any intellectual deficiencies but because of a history of absenteeism:

> she was absent considerably more days than present in the two years she attended the first grade and the three years she was in the second grade. In the first year she attended the first grade she was present 41 days and absent 139 days. In the second year she attended the first grade, she was present 76 days and absent 104 days. In the second grade she was present 75 days and absent 105 days the first year, present 75 days and absent 82 days in the second year, and in the third year, present 90 days and absent 90 days. Although her attendance increased in subsequent years, the number of days she was absent was extremely high with 94 days

absences in the first year of the third grade, attending school only 84 days; she was absent 59 days and present 121 days in the second year of third grade, absent 24 days and present 156 in the fourth grade, absent 20 days and present 160 in the fifth grade, absent 31 days and present 149 days in the sixth grade, and absent 42 days and present 131 days in the seventh grade before withdrawing. Therefore, she understandably missed critical instruction in reading and writing, as well as other core curricula. . . .

(Tr. 18.)   While the Court could draw a different conclusion from Walker's school records, [5] it cannot say that the ALJ's interpretation of the records is unreasonable.   Taken along with the non-examining psychiatrist's conclusion that substance abuse may have contributed to Walker's intellectual deficiencies and Walker's admissions to Dr. Chester that she had been struck in the head several times by an abusive husband and had abused cocaine, prescription drugs, and alcohol for quite some time, the Court is satisfied that good cause supports the ALJ's conclusion discounting Dr. Chester's diagnosis.

Moreover, other evidence of record amply supports the ALJ's ultimate conclusion that Walker did not manifest cognitive deficiencies prior to age 22.   He noted that claimant had not even raised any mental

---

[5] Claimant contends that she still attended school for eleven years without exceeding second grade level in reading, and she actually regressed in math. (Doc. 9 at 21.) The absences, according to claimant, do not explain her extremely low levels of achievement. (*Id.*)

health related allegations at the time she initially filed her claim. (Tr. 18.) Additionally, Walker did not claim to be disabled at 22; instead, she admitted that she had the ability to work long after her 22 birthday.[6] (Tr. 18-19.) He also pointed to several inconsistencies which undercut her credibility:

> The claimant reported to the consultative examiner in February 2006 (Exhibit 6F) that she completed the 5th grade with special education assistance and, other than employment as a cook from 2002-2005 and work at a sewing factory (1991-92), she had no other history of employment. School records (Exhibit 16E) establish that the claimant did not withdraw in the 5th grade and that she was not served by special education until the 7th grade -- the same school year in which she withdrew from school to start working "in the fields" (Exhibit 1F). Claimant's earnings record (Exhibit 6D) reflects net earnings from self-employment income, in 2002 of $3,233.00 in addition to earnings as a cook beginning that year. The claimant admitted in May 2007 that she was cleaning house for a friend occasionally because this friend (and others as well) was helping her with her rent -- essentially wages-in-kind. During a medical consultative evaluation on May 26, 2007 (Exhibit. 12F), the claimant stated that her last job was as a cook; however, she could no longer continue to do this job secondary to excruciating pain and inability to lift heavy objects. Based on her own reports (Exhibit 2E) . . . this job ended due to her getting into trouble (incarceration) -- not because of physical incapacity (Exhibit 3F).

(Tr. 18-19 footnote added.)

---

[6] Claimant contends that her work history is not determinative here. (Doc. 9 at 22.) After all, many who qualify as moderately retarded still manage to obtain employment. (*Id.*) She cites to cases holding that where the listing criteria are met, benefits are due despite a claimant's past ability to work. (*Id.* at 22-23.) This is not such a case, however, since claimant did not meet the listing criteria.

Walker's reading ability had also substantially dropped since her time in school, further supporting his conclusion that her intellectual abilities diminished after the age of 22:

> Based on current allegations, achievement test results, and school records, the claimant would appear to be functionally illiterate. Yet, in a function report (Exhibit 15E) the claimant reported that she "reads and studies" her Bible daily (Exhibit 4E) and made no allegation of difficulty reading and writing due to cognitive deficits and/or illiteracy at that time.[7] While school records show that the claimant repeated several grades and was placed into "special education" in the 7th grade -- not the 5th grade as alleged,[8] there are no psychometric test results to support that the claimant functioned with significant cognitive deficits or that adaptive functioning was severely limited only that, at the time she left school in the 7th grade, her reading ability was at the 2.4 grade level -- not kindergarten level she demonstrated in 2006 achievement tests.[9]

---

[7] Claimant states that it was not established whether she read a standard or child's edition of the Bible or whether she actually comprehended what she was reading. (Doc. 9 at 21.) Walker never put any such evidence in the record. While the hearing before the ALJ is not adversarial in nature, she cannot withhold information and accuse the ALJ later of failing to elicit favorable facts. Despite the rebuttable presumption that claimant was mentally impaired prior to her 22nd birthday, she still carries the ultimate burden of proof here. *Hodges*, 276 F.3d at 1269 (the presumption "does not, however, shift the burden of proof from a claimant to prove entitlement to social security benefits").

[8] Claimant states that "her records, which admittedly are hard to read, appear to bear the notation "Remedial" or "Rem." At least for fifth or sixth grade, and possibly fourth." (Doc. 9 at 20.) Even if the ALJ misread the school records (which are, as claimant concedes, quite difficult to read), it does not stand in the way of the ALJ's conclusion that remedial school was necessary based upon claimant's frequent absences rather than from any pre-existing mental impairment.

[9] Claimant contends that the ALJ made too much of this point. Neither finding is anomalous, according to claimant, since unused academic skills deteriorate over time. (Doc. 9 at 21.) Of course, based upon her own testimony, she regularly

(Tr. 18 (footnotes added).)

The ALJ also detailed claimant's ability to perform daily activities, which are inconsistent with her claims of developmental mental retardation:

> In her function report (Exhibit 4E.), the claimant stated that she is able to pay bills and count change, contrary to current allegations by the claimant and argument by her representative of inability to do so. . . .[10] The claimant advised the psychological consultative examiner that she cooks one meal each day which usually consists of a meat and vegetables (Exhibit 9F). She has no difficulty operating kitchen appliances without assistance. She also has no difficulty washing dishes and performing vacuuming, dusting, and laundry. She has a driver's license but does not own an automobile. . . . [C]laimant reportedly babysat her grandchildren, at times.

---

exercises those skills through reading her Bible. While the Court might draw another conclusion from the facts presented, its duty here is simply to determine whether the ALJ's opinion was supported by evidence that might be accepted by a reasonable person, not to replace the ALJ's conclusions with its own.

[10] Claimant admits that she initially stated that she could manage her finances but later changed her claim, contending that she could not. (Doc. 9 at 18.) She states that she has suffered memory deterioration since the case began and can no longer handle her finances. (*Id.*) The ALJ was free to conclude that claimant had changed her testimony to better fit her evolving claims. He points out that she did not raise any mental health allegations at the time of initial filing. (Tr. 18.) Moreover, even if her mental condition has further deteriorated, it actually undercuts her claim that she suffered from mental deficiencies prior to age 22. The *Hodges* presumption is based upon the assumption that intelligence remains stable throughout one's lifetime. Claimant has admitted that her mental functioning is unstable and has declined between March 2007 and November 2007. (Doc. 9 at 23.)

(Tr. 18, 19, 20 (footnote added).) And he noted the lack of any noticeable cognitive deficits mentioned by several medical providers:

> Mental status exams by treating sources throughout the pertinent period were within normal limits. The global assessments of functioning, both prior year and current, as assessed by the treating psychiatrist at Ogeechee Behavioral Services on June 30, 2004 were 60, indicative of no more than mildly moderate symptoms/limitations -- an assessment that suggests a greater degree of severity, as described by the claimant, than documented findings in mental status exams. In this doctor's opinion, claimant's intelligence was average and she was stable on medications. Mental status exam in November 2004 despite, claimant's lack of medication compliance for 2 months, was within normal limits except for a mildly dysphoric mood. There are no noted impressions by any treating medical or mental health source that she has any cognitive deficits or functions with less than average intelligence.

(Tr. 20-21.)

In sum, the ALJ reasonably concluded that claimant's history does not support her assertion that any intelligence deficit (or, for that matter, adaptive functioning deficits) existed prior to her 22nd birthday. Instead, substantial evidence supports his conclusion that her mental functioning has declined largely as a result of her lifestyle.

Claimant also contends that the ALJ erred because she has a low IQ and deficits in four areas of adaptive functioning, "she now functions exactly like a retarded person" and therefore "equals" the 12.05(B) & (C)

18

listings. (Doc. 9 at 25.) To equal a listing, "the medical findings must be 'at least equal in severity and duration to the listed findings.'" *Davenport v. Astrue*, 403 F. App'x 352, 353 (11th Cir. 2010 (quoting 20 C.F.R. § 404.1526(a)); 20 C.F.R. § 416.926. Here, the evidence of record does not establish that claimant meets the durational aspect of the listings. Claimant contends that her low IQ scores and deficits in adaptive functioning are enough to offset any listing deficiencies. (Doc. 15 at 5.) But low IQ scores and adaptive deficits are already required to make out a claim under 12.05. In order to equal the listing, she needs to offer "other findings related to [her] impairment that are at least of equal medical significance to the required criteria." 20 C.F.R. § 416.926(b)(1).[11] She has not done so.

### 2. *Full and fair record*

Walker next contends that the ALJ failed to develop a full and fair record. (Doc. 9 at 25.) She claims to have previously received disability benefits that were terminated only upon her incarceration for drug crimes. (*Id.* at 25-26.) She argues that the ALJ was obliged to obtain

---

[11] A claimant can also equal a listing if her impairments are at least of medical significance to a closely related listed impairment, or if she has a combination of impairments that equal a listed impairment. 20 C.F.R. § 416.926. Walker does not claim to fit within either of those equivalence methodologies. (Doc. 15 at 5.)

those records prior to issuing an unfavorable decision. (*Id.*) The Commissioner utterly failed to brief this issue. (Doc. 14.)

The record shows that claimant worked 32 hours per week from the 2002 until her incarceration in 2005. (Tr. 131-32.) While she told Dr. Chester that she had received benefits until she was incarcerated (tr. 296; tr. 314), it appears that she was mistaken or she received benefits illegally while she maintained employment. Claimant has not pointed to any other page in the record showing the existence of any prior disability claim. Moreover, claimant has not shown that the old records (if they even exist) were material to her current claims. This claim fails.

## III. CONCLUSION

Based on the foregoing, the Commissioner's decision denying benefits should be **AFFIRMED**.

**SO REPORTED AND RECOMMENDED** this _27th_ day of October, 2011.

_____
UNITED STATES MAGISTRATE JUDGE
SOUTHERN DISTRICT OF GEORGIA